2020 IL App (1st) 191409

No. 1-19-1409

Opinion filed December 31, 2020

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| ARIE ZWEIG, Individually and as Trustee of the Arie Zweig Self Declaration of Trust Dated June 28, 1990, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 17 L 2837 |
| GERALD MILLER and VANASCO, GENELLY & MILLER, | ) ) ) | Honorable |
| | ) ) | Brigid M. McGrath, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal arose from the legal malpractice action that plaintiff, Arie Zweig, individually

and as trustee of the Arie Zweig Self Declaration of Trust Dated June 28, 1990, filed against

defendants, Gerald Miller and Vanasco, Genelly & Miller. The trial court granted summary

judgment in favor of defendants based on the court's determination that plaintiff's legal

malpractice claim was barred by the two-year statute of limitations set forth in section 13-214.3(b) of the Code of Civil Procedure (Code) (735 ILCS 5/13-214.3(b) (West 2016)).

¶ 2    On appeal, plaintiff argues that his malpractice action was timely filed within two years of the date he settled the underlying litigation that involved a business investment where defendants had represented him. Specifically, plaintiff argues that his malpractice cause of action accrued when that underlying litigation settled because he did not suffer a pecuniary loss until the settlement occurred. He also argues that filing his malpractice action before the settlement would have been premature and contrary to the strong policy rationale against "prophylactic malpractice cases," wherein the legal malpractice case is completely dependent on the outcome of the pending underlying case. Alternatively, plaintiff argues that a genuine issue of material fact exists regarding when he knew or should have known of his injury.

¶ 3    For the reasons that follow, we hold that summary judgment in favor of defendants was proper because plaintiff failed to file his complaint within the two-year statute of limitations, which began to run, at the latest, when he knew, as a matter of law, of his injury and that it was wrongfully caused, *i.e.*, when he incurred legal fees directly caused by hiring additional counsel to attempt to achieve a result in the underlying case that was not achieved during defendants' representation. Accordingly, we affirm the judgment of the trial court.[1]

¶ 4                                I. BACKGROUND

¶ 5    In December 2010, plaintiff Zweig and his wife had dinner with their close friends, Mr. and Mrs. Bozorgi, who discussed an investment opportunity. The Bozorgis asked plaintiff to join

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

them in a partnership, Bedford Med, LLC (Bedford), to build an ambulatory surgical center and medical office building. They asked him to invest $2 million for a 40% membership, which would be increased to 49% when the project was finished. Bedford was owned by a holding company, which was owned by four members of the Bozorgi family. Plaintiff forwarded the materials for the investment to his counsel, defendants Miller and Vanasco, Genelly & Miller, whom plaintiff had retained for his business transactions for over 20 years. One document of the materials included exhibit D, which provided:

> "The Company shall distribute (in preference to any other Distribution) up to [redacted] as and when the Company receives such funds from the Investor upon the issuance of Membership Interests by the Company to the Investor (whether in a single issuance or in a series of issuances). Upon each such preferential Distribution to Magna, Investor's and Magna's Capital Contributions shall be deemed to be adjusted on a dollar for dollar basis and Magna's and Investor's Percentage Interests shall be adjusted accordingly."

¶ 6    In his deposition, plaintiff explained that English was not his native language, so he relied on defendants to adequately review the documents, advise him about the implications of the documents he would sign, and recommend any amendments so that the agreement reflected his intentions.

¶ 7    However, Miller stated in his deposition that ever since his initial representation of plaintiff in 1986, plaintiff always made his own business decisions and never sought investment advice or any financial analysis of any proposed or actual investments from defendants. Regarding the Bedford investment, plaintiff told Miller that he was contributing capital investment funds to

increase the equity in Bedford, not to purchase shares of stock. Plaintiff said it was a "done deal" with his great friends and he wanted Miller to review only the issue of what kind of management control plaintiff would have as a minority owner in Bedford. The nature, scope and extent of plaintiff's engagement of defendants was limited to reviewing plaintiff's management authority. Plaintiff personally handled all other aspects of the investment on his own. Based on their long relationship, where plaintiff would negotiate defendant's invoices to remove charges for services he deemed unnecessary or not requested, Miller reviewed just the management provisions of the agreement and found them to be "pretty standard" and thought they "looked fine." Miller also looked at the contribution agreement and transfer provisions that would affect plaintiff's ability to use his trust.

¶ 8    In 2011, plaintiff signed the documents and submitted his investment funds. He did not communicate with Miller concerning the Bedford investment until mid-2013, when plaintiff mentioned an unchallenged real estate assessment regarding Bedford and that he had not received its financial and tax information.

¶ 9    On September 25, 2013, plaintiff and Miller met with the Bozorgis and their attorney to discuss management and tax issues involving Bedford. At that meeting, plaintiff and Miller were shocked when the Bozorgis' counsel disclosed that plaintiff's investment had been taken out of Bedford and distributed to the Bozorgi holding company members. Plaintiff and Miller objected, stating that plaintiff's investment was a capital contribution, not a purchase and sale, and the Bozorgis had no authority to distribute that investment. The Bozorgis, however, asserted they had a clear right under exhibit D to take the money out.

¶ 10    According to Miller's deposition, he argued at the meeting that the contract was a contribution agreement and pointed out contract provisions that prohibited the distribution and required management approval of anything in exhibit D, which referred to only $1.6 million. The meeting became very acrimonious. Plaintiff said the Bozorgis were stealing and cheating him and he never would have agreed to such a deal. Mr. Bozorgi suggested they could sit down and resolve the problem, but his daughter remained entrenched. The meeting ended shortly thereafter. Miller walked to the parking garage with plaintiff and his wife, and plaintiff said he would try to talk to Mr. Bozorgi and "see what's going on here." Plaintiff asked Miller to talk to the Bozorgis' counsel. Miller had not read or seen exhibit D before that meeting.

¶ 11    In his deposition, plaintiff said Miller assured him that the Bozorgis had breached their contract, which prohibited the transfer of his investment. Plaintiff trusted Miller and believed the transfer was some mistake by Mr. Bozorgi's daughter and would be resolved soon. A few days after the meeting, plaintiff spoke to a business colleague who was an experienced real estate developer. When the colleague read exhibit D, he said, "Oh my God, how did you sign those things?" and told plaintiff he never should have signed the agreement. Then plaintiff gave his wife exhibit D to read, and she told him he should not have invested because exhibit D stated that the holding company would take his money.

¶ 12    Plaintiff, Miller, the Bozorgis, and their counsel had several discussions and eventually seemed to reach an agreement to resolve the matter. However, after Miller drafted a settlement agreement in the spring of 2014, the Bozorgis refused to sign it.

¶ 13    On August 8, 2014, plaintiff sued the Bozorgi holding company members and other related entities and individuals (the holding company actions), alleging breach of contract, breach of

fiduciary duty, and a statutory violation. Plaintiff sought an accounting, the return of his investment and damages he suffered from his involvement with Bedford. Plaintiff hired other counsel to handle the holding company actions because defendants were not litigators. The first payment of legal fees to plaintiff's other counsel in the holding company actions was made by December 12, 2014, in the amount of $55,721.20. The holding company actions eventually consisted of four cases in court and an arbitration forum. Defendants' involvement in the holding company actions was limited to consulting and reviewing briefs.

¶ 14    On July 1, 2015, plaintiff and defendants entered an agreement to toll the statute of limitations for any malpractice action plaintiff might have against defendants. Specifically, they agreed to toll the limitation period for six months or the remainder of any applicable limitations period, whichever was longer, following the entry of final non-appealable judgments in all the holding company actions or the execution of a settlement agreement that fully and finally settled the holding company actions.

¶ 15    On September 15, 2016, the parties settled the holding company actions. Ultimately, plaintiff's other counsel in the holding company actions were paid over $2 million. All of those payments were made by R.A. Zweig, Inc., which was an S corporation wholly owned by plaintiff.

¶ 16    Defendants continued to work for plaintiff until well into 2016, when plaintiff terminated the relationship, stating that he was sending his legal work to a family member's law firm.

¶ 17    According to plaintiff's deposition, Miller told him at some point that he was very sorry about the case and did not read the contract himself but instead delegated the matter to one of his associates. Plaintiff said Miller had been a close friend and attended family events, so it was a hard and uncomfortable decision to sue him. However, if Miller had explained the implications of

exhibit D, plaintiff never would have invested in Bedford and would have avoided the substantial financial losses and aggravation of the holding company litigation.

¶ 18    In Miller's deposition, he testified that plaintiff told him shortly after the September 25, 2013, meeting that he should have "caught" exhibit D. Miller responded that he did what plaintiff asked him to do, the Bozorgis did not have the right to transfer the funds, and hopefully they could get this fixed. Plaintiff then said that people were saying he should sue Miller. Miller asked him what he was talking about and why he would do that, and plaintiff responded that he would be going after the insurance, not after Miller. Plaintiff then retained other counsel to handle the Bedford matter, and Miller was "pretty much out of the loop" after drafting the settlement agreement in the spring of 2014. After plaintiff sued the Bozorgis in August 2014, plaintiff again complained to Miller that he should have "caught" exhibit D, and Miller responded, "How would I have seen that? I just did what you asked me to do." Miller never apologized to plaintiff for his work involving Bedford and continued working for plaintiff well into 2016. Miller testified that if he had seen exhibit D during his review of the management provisions, it might have caused him to look at other provisions in the agreement, but he probably would not have been concerned because there were enough provisions already in the agreement that prevented the transfer of plaintiff's investment funds out of Bedford.

¶ 19    On March 17, 2017, *i.e.*, six months and one day following the settlement, plaintiff filed this malpractice action against defendants, alleging they breached their standard of care when they failed to adequately review the 2011 investment documents and their implications, advise him that the transaction amounted to a purchase of a portion of the holding company's equity in Bedford rather than a capital contribution to Bedford, and request changes to the documents to prevent the

distribution of plaintiff's investment to the members of the holding company. Plaintiff also alleged he would not have invested in Bedford if defendants had properly advised him. Finally, plaintiff alleged that defendants' negligence caused him to incur attorney fees in the holding company actions and opportunity costs resulting from the loss of use of his $2 million investment.

¶ 20    Defendants moved for summary judgment, arguing the malpractice action was time-barred because (1) the statute of limitations began to run on September 25, 2013, when plaintiff learned that his investment had been distributed and defendants purportedly failed to adequately review the contract and advise him about the implications of exhibit D, (2) at the latest, plaintiff's malpractice action accrued as a matter of law when he sued the holding company members on August 8, 2014, (3) the statute of limitations for the malpractice action expired before the holding company actions settled on September 15, 2016, (4) the tolling agreement provided that plaintiff had six months from the September 15, 2016, settlement to file his malpractice action, and (5) plaintiff did not file his malpractice action until March 17, 2017, which was six months and one day after the settlement. Defendants also argued that plaintiff had no recoverable damages because R.A. Zweig, Inc., a separate corporate entity that was not a plaintiff, had paid the legal fees incurred in the holding company actions and Illinois law does not allow recovery to a legal malpractice plaintiff for the loss of use of funds.

¶ 21    Plaintiff responded that his malpractice action was timely filed because it did not accrue until he suffered an actual pecuniary injury, which occurred when the holding company actions settled on September 15, 2016. According to plaintiff, before that settlement occurred, any pecuniary injury he suffered as a result of defendants' malpractice was speculative because he could have succeeded on his claims in the underlying holding company actions. Moreover,

concurrently pursuing his claims against the holding company and malpractice action against defendants would have forced him to take inconsistent positions regarding the interpretation of exhibit D and thereby undermine his claims in the holding company actions. Plaintiff also argued that the legal fees constituted his damages because he was the sole shareholder of the pass-through S corporation that paid the legal fees[2] and that he could recover for the loss of use of his funds because the holding company actions included equitable claims.

¶ 22    The trial court granted summary judgment in favor of defendants, finding that plaintiff failed to file his legal malpractice action within the two-year limitation period of its accrual, which occurred when he suspected that the members of the holding company had defrauded him. Specifically, the court found that the two-year limitation period was triggered at the September 25, 2013, meeting because plaintiff realized that his injury was wrongfully caused when he and Miller were shocked to learn that plaintiff's investment was taken out of Bedford, Miller admitted that he did not review exhibit D, plaintiff suspected that the members of the holding company had defrauded him, and defendants investigated the breach of contract issue. Plaintiff appealed.

¶ 23                                    II. ANALYSIS

¶ 24    Summary judgment is proper where the pleadings, admissions, depositions, and affidavits on file demonstrate there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2016). All evidence is construed strictly against the moving party and liberally in favor of the nonmoving party. *Buenz v. Frontline*

_____

[2]Plaintiff states that, as an S corporation, any profits R.A. Zweig, Inc. generated passed through directly to his personal income, and R.A. Zweig, Inc.'s direct payment of his personal expenses was treated as a distribution of profits to him. See 26 U.S.C. §§ 1368, 1375(d) (2012); *Attebury v. United States*, 430 F.2d 1162, 1166-67 (5th Cir. 1970); *Steinberg v. Buczynski*, 40 F.3d 890, 891-92 (7th Cir. 1994).

*Transportation Co.*, 227 Ill. 2d 302, 308 (2008). Summary judgment is a drastic measure that should only be granted if the movant's right thereto is clear and free from doubt. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). We review a trial court's decision granting summary judgment *de novo*. *Id.*; see *Thomas v. Weatherguard Construction Co.*, 2015 IL App (1st) 142785, ¶ 63 (*de novo* consideration means the reviewing court performs the same analysis that a trial court would perform). The reviewing court may affirm the circuit court's grant of summary judgment on any basis appearing in the record. *Gallaher v. Hasbrouk*, 2013 IL App (1st) 122969, ¶ 17.

¶ 25    A claim for legal malpractice requires (1) an attorney-client relationship, (2) a duty arising from that relationship, (3) a breach of that duty, and (4) actual damages or injury proximately caused by the breach. *Romano v. Morrisroe*, 326 Ill. App. 3d 26, 28 (2001). Section 13-214.3(b) of the Code provides that

> "[a]n action for damages based on tort, contract, or otherwise *** against an attorney arising out of an act or omission in the performance of professional services *** must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2016).

Section 13-214.3(b) incorporates the discovery rule, which delays commencement of the statute of limitations until the plaintiff " 'knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused.' " *Morris v. Margulis*, 197 Ill. 2d 28, 35-36 (2001) (quoting *Witherell v. Weimer*, 85 Ill. 2d 146, 156 (1981)).

¶ 26    Knowledge that an injury has been wrongfully caused "does not mean knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action." (Internal quotation marks omitted.) *Carlson v. Fish*, 2015 IL App (1st) 140526, ¶ 23. "A person knows or reasonably should know an injury is 'wrongfully caused' when he or she possesses sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Id.* Once a party knows or reasonably should know both of his injury and that it was wrongfully caused, "the burden is upon the injured person to inquire further as to the existence of a cause of action." (Internal quotation marks omitted.) *Id.*

¶ 27    Plaintiff argues that defendants were not entitled to summary judgment on his malpractice action because the two-year statute of limitations period did not commence until he settled the underlying holding company actions on September 15, 2016, at which time he suffered an actual pecuniary injury. Plaintiff argues that if he had commenced his malpractice claim before the September 2016 settlement, the case would have been subject to dismissal as premature. Furthermore, pursuing his malpractice claim against defendants while the underlying holding company actions were pending would have required him to take inconsistent positions regarding the interpretation of exhibit D and the appropriateness of defendants' conduct in adequately reviewing that document. Alternatively, plaintiff argues that a genuine issue of material fact exists regarding when he knew or should have known of his injury and that it was wrongfully caused because he trusted defendants, who had represented him for 30 years, and believed Miller's assertion that the contract prohibited the Bozorgis from taking plaintiff's investment funds out of Bedford.

¶ 28 Defendants argue that summary judgment in their favor was proper because plaintiff's malpractice action accrued on September 25, 2013, when plaintiff was shocked to discover that his investment funds had been distributed. At that time, plaintiff knew he had been harmed and that at least the Bozorgi holding company members had harmed him. Defendants argue that plaintiff did not have to be aware that defendants' purported malpractice caused his harm to trigger the statute of limitations on his malpractice action; he had to be aware only that he was wrongfully harmed. Furthermore, shortly after September 25, 2013, plaintiff's colleague and wife told him that exhibit D allowed his investment funds to be distributed. Because plaintiff's malpractice action was premised on the theory that defendants failed to advise him about the effect of exhibit D, his malpractice action accrued at that time.

¶ 29 Defendants contend that the tolling agreement determined whether plaintiff's malpractice action was timely because the statute of limitations had already expired when the underlying holding company actions settled. The tolling agreement provided that plaintiff had to file his malpractice action six months after that settlement, but he missed that deadline by one day. Further, defendants argue that plaintiff has no actionable damages because the 2016 settlement made him whole regarding his $2 million investment and another entity besides plaintiff paid the attorney fees plaintiff incurred in the underlying holding company actions. Defendants also argue that plaintiff is not entitled to damages for the loss of use of his investment funds because that relief would constitute prejudgment interest, which is not recoverable.

¶ 30 The statute of limitations for a legal malpractice claim does not begin to run when the attorney allegedly commits a negligent act but only when the plaintiff realizes an injury as a result of that negligence. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 90 (1995).

To be considered injured, a legal client must suffer a loss for which he may seek monetary damages. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). If the damages are as yet "speculative," then the cause of action has not yet accrued, and the malpractice suit is premature. *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 353 (1998). Damages are speculative only if their existence is uncertain, not if the amount is uncertain or yet to be fully determined. *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 307. Generally, the legal client's loss for which he may seek damages will not occur until he has suffered an adverse judgment, settlement, or dismissal of the underlying action caused by the attorney's alleged negligence. *Lucey*, 301 Ill. App. 3d at 356. However, a malpractice claim can accrue before an adverse judgment if it is "plainly obvious *** that [the plaintiff] has been injured as the result of professional negligence or where an attorney's neglect is a direct cause of the legal expense incurred by the plaintiff." (Internal quotation marks omitted.) *Estate of Bass v. Katten*, 375 Ill. App. 3d 62, 70 (2007).

¶ 31    According to the record, plaintiff had retained defendants and asked them to review documents for a business investment where plaintiff would make a capital contribution in Bedford in exchange for a minority ownership interest in it. In 2011, plaintiff signed the documents and invested $2 million in Bedford. On September 25, 2013, plaintiff and Miller discovered that, contrary to plaintiff's intentions, his investment had been distributed to the members of Bedford's holding company, who cited the provisions of exhibit D as their authority to take those funds. Miller did not review exhibit D, however, he assured plaintiff that the transfer of his investment funds was a breach of contract. During the following week, plaintiff spoke about the implications of exhibit D with his business colleague and his wife, who both told him that he should not have

signed the agreement because exhibit D allowed Bedford to transfer any funds he invested to the holding company.

¶ 32    Plaintiff, after hiring other attorneys, commenced the underlying holding company actions on August 8, 2014. These attorneys were first paid by December 12, 2014. On July 1, 2015, plaintiff and defendants entered an agreement to toll the statute of limitations for any legal malpractice action. Plaintiff settled the holding company actions on September 15, 2016, and sued defendants for malpractice on March 17, 2017.

¶ 33    Construing the evidence strictly against defendants and in favor of plaintiff, we find that there was no genuine issue as to any material fact and that defendants were entitled to judgment because plaintiff's malpractice claim accrued, at the latest and as a matter of law, by December 12, 2014, which was when he was aware of defendants' purported neglect and was injured. By then, plaintiff knew that the dispute about the interpretation of exhibit D, which document he alleged defendants negligently failed to review, advise him about, and recommend amendments to, directly caused plaintiff's legal expenses in the underlying holding company actions since plaintiff had to retain other counsel to litigate and arbitrate the holding company actions in an effort to achieve the result plaintiff initially sought through defendants' representation in the 2011 transaction. *Compare Goran v. Glieberman*, 276 Ill. App. 3d 590, 596 (1995) (the plaintiff's legal malpractice cause of action accrued when she incurred attorney fees of $1297 to fix the defendant attorney's errors because the plaintiff had to hire substitute counsel to redo the record on appeal and brief that were struck by the appellate court for technical defects), with *Warnock v. Karm Winand & Patterson*, 376 Ill. App. 3d 364, 369-70 (2007) (where plaintiffs could not have known that the letter agreements for a real estate sale drafted by their attorney were faulty until the trial

court granted defendants' motion for summary judgment, the limitations period did not begin to run until the adverse judgment was entered), and *York Woods Community Ass'n v. O'Brien*, 353 Ill. App. 3d 293, 299 (2004) (when the plaintiff incurred the additional attorney fees, it was not yet clear that those fees were directly attributable to former counsel's alleged neglect, so the plaintiff's malpractice action did not accrue until the court decided in the underlying litigation that former counsel's incorporation of plaintiff had failed).

¶ 34     Plaintiff cites *Lucey*, 301 Ill. App. 3d 349, to support his claim that filing his malpractice lawsuit before the settlement of the holding company actions would have been premature. In *Lucey*, the plaintiff started his own brokerage firm and consulted a law firm to determine whether he could solicit his former employer's clients. The plaintiff followed the law firm's advice, and a main client of his former employer transferred its account to the plaintiff's firm. The former employer sued the plaintiff for the loss of the account, and while that action was pending, the plaintiff filed a legal malpractice action against the law firm he consulted, alleging he had received inaccurate advice. This court held that the plaintiff's malpractice action was premature and subject to dismissal without prejudice on statute of limitations grounds because, under the circumstances, his damages were speculative and no cause of action for malpractice could be said to exist since it was not clear that he had been injured as the result of professional negligence. *Id.* at 353, 355, 358. His damages were only a mere potentiality until the underlying litigation with his former employer was resolved. *Id.* at 359.

¶ 35     The holding in *Lucey* is inapposite to this case. Plaintiff was not sued for any alleged negligence by defendants. Unlike *Lucey*, where it was unclear that the attorneys had provided any negligent service to the plaintiff, here, plaintiff Zweig argued that defendant's negligence was a

direct cause of the legal expenses he incurred to rectify the damage he sustained when the holding company distributed his $2 million. Furthermore, the possibility of plaintiff's success in the underlying holding company actions would not have negated the injury caused by defendants' alleged malpractice, namely, incurring additional attorney fees by having to hire litigation counsel to compel the holding company members to return plaintiff's transferred investment funds. Consequently, the policy rationale against "prophylactic malpractice cases," as mentioned in *York Woods Community Ass'n*, 353 Ill. App. 3d at 299, is not a factor in this case.

¶ 36    Finally, plaintiff argues that pursuing his malpractice action against defendants while his claims in the holding company actions were still pending would have forced him to take inconsistent positions regarding the interpretation of exhibit D and thereby undermined his claims in the holding company actions. Plaintiff's argument is not persuasive. As is commonly done in the context of legal malpractice actions, the parties entered into an agreement that tolled the statute of limitations pending the outcome of the underlying litigation. Consequently, plaintiff avoided the quandary of taking inconsistent positions regarding the interpretation of exhibit D.

¶ 37                              III. CONCLUSION

¶ 38    We conclude that the statute of limitations for plaintiff's legal malpractice claim commenced at the latest and as a matter of law by December 12, 2014, the date he first paid attorney fees to other counsel in the underlying holding company actions to attempt to avoid the effect of defendants' alleged error regarding exhibit D in the Bedford investment. As a result, plaintiff's lawsuit, filed on March 17, 2017, failed to comply with the two-year statute of limitations. Consequently, the parties' tolling agreement, which required plaintiff to file his malpractice lawsuit within six months of the September 15, 2016, settlement of the holding

company actions, determined whether plaintiff's malpractice action was timely filed. Because it was filed six months and one day after the settlement, the lawsuit was not timely. Accordingly, we conclude that the trial court properly granted summary judgment in favor of defendants.

¶ 39   For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 40   Affirmed.

---

**No. 1-19-1409**

---

| | |
|---|---|
| **Cite as:** | *Zweig v. Miller*, 2020 IL App (1st) 191409 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-L-2837; the Hon. Brigid M. McGrath, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert D. Sweeney, John J. Scharkey, and Garrett H. Nye, of Sweeney, Scharkey & Blanchard LLC, of Chicago, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Adam R. Vaught, Terrance P. McAvoy, and Steven R. Bonanno, of Hinshaw & Culbertson LLP, of Chicago, for appellees. |

---