**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200245-U

Order filed March 24, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| PEORIA-TAZEWELL PATHOLOGY GROUP, S.C., an Illinois Corporation, for Itself and as Plan Sponsor and Administrator for PEORIA-TAZEWELL PATHOLOGY GROUP, S.C. CASH BALANCE PENSION PLAN #010, a Cash Balance Pension Plan, and PEORIA-TAZEWELL PATHOLOGY GROUP, S.C. PROFIT SHARING 401(K) PLAN, a Profit Sharing 401(k) Plan, | ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiffs-Appellants, | ) ) | Appeal No. 3-20-0245 Circuit No. 15-L-267 |
| v. | ) ) | |
| SUTKOWSKI LAW OFFICE LTD., an Illinois Corporation f/k/a SUTKOWSKI & RHOADS LTD. and EDWARD F. SUTKOWSKI, | ) ) ) ) ) | |
| Defendants-Appellees. | ) ) | Honorable Michael P. McCuskey, Judge, Presiding. |

JUSTICE HAUPTMAN delivered the judgment of the court.
Presiding Justice O'Brien and Justice Lytton concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court did not err by dismissing counts I and II of plaintiffs' fourth amended complaint, with prejudice, based on the limitations period contained in section 13-214.3(b) of the Code of Civil Procedure. As a result, we do not address the repose period contained in section 13-214.3(c) of the Code of Civil Procedure.

¶ 2    Plaintiffs, Peoria-Tazewell Pathology Group, S.C. (Pathology Group), and Peoria-Tazewell Pathology Group, S.C., Cash Balance Pension Plan #010 (Pension Plan), filed a six-count fourth amended complaint against defendants, Sutkowski Law Office, Ltd. and Edward F. Sutkowski. In counts I and II, plaintiffs alleged defendants committed legal malpractice as plan practitioners of the Pension Plan. Defendants requested a dismissal of counts I and II under section 2-619(a)(5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(5) (West 2018)), arguing those counts were barred by the limitations and/or repose periods contained in section 13-214.3(b) and (c) of the Code. 735 ILCS 5/13-214.3(b), (c) (West 2018). After a hearing, the circuit court dismissed counts I and II with prejudice. Plaintiffs appeal.

¶ 3                                    I. BACKGROUND

¶ 4    Plaintiffs filed this lawsuit on December 29, 2015.[1] On July 15, 2019, plaintiffs filed a six-count fourth amended complaint. In counts I and II, plaintiffs asserted the same allegations separately against each defendant. Plaintiffs alleged, between 1980 and 2014, defendants provided legal services as plan practitioners of the Pension Plan. Defendants allegedly committed legal malpractice by failing to amend the Pension Plan to eliminate a 62% hypothetical allocation group that became effective on January 1, 2007, for the sole intended benefit of a single medical professional. That single medical professional retired on June 30, 2010, yet defendants took no action to eliminate the 62% hypothetical allocation group.[2]

¶ 5    In early-2012, the Pathology Group was recruiting a subsequent medical professional. On March 7, 2012, the subsequent medical professional emailed a representative of the Pathology

---

[1]This lawsuit was also filed by plaintiff, Peoria-Tazewell Pathology Group, S.C. Profit Sharing 401(k) Plan. The issues presented on appeal pertain only to the Pathology Group and the Pension Plan.
    [2]Unlike in three prior complaints, plaintiffs did not allege defendants failed, in 2007, to draft the provision for a 62% hypothetical allocation group so that it applied only to the single medical professional.

Group to inquire about the qualifications for the 62% hypothetical allocation group. That same day, the representative of the Pathology Group forwarded the subsequent medical professional's email to defendants. Between March and July 2012, when the Pathology Group hired the subsequent medical professional, defendants allegedly failed to investigate or respond to the inquiries about the 62% hypothetical allocation group. The subsequent medical professional, who qualified for the 62% hypothetical allocation group, was not afforded that benefit. As such, plaintiffs alleged the Pension Plan began to operate contrary to its terms, resulting in the loss of its tax-qualified status with the Internal Revenue Service (IRS). Plaintiffs alleged, when a retirement plan loses its tax-qualified status, "the employer loses some or all of its income tax deduction for contributions made to the plan," "the income of the retirement plan is subject to current income taxation," "all employees must report the vested value of their accrued benefit as taxable income[] and may be subject to early withdrawal penalties," and "accumulated retirement plan benefit[s] cannot be transferred to an IRA or other tax deferred vehicle." Defendants allegedly "regularly billed" plaintiffs for services, including the review, revision, and amendment of the Pension Plan, to ensure the Pension Plan retained its tax-qualified status.

¶ 6         Plaintiffs alleged, in December 2013, representatives of the Pathology Group and defendants exchanged various communications regarding the subsequent medical professional and the 62% hypothetical allocation group. Plaintiffs alleged defendants "exchanged correspondence with *** [the Pathology Group] and the Pension Plan that *** [the subsequent medical professional] may be entitled to the 62% hypothetical allocation [group] based upon a 'miscalculation.' " At that time, plaintiffs also alleged the parties "discussed strategies for recouping th[e] excess benefits, such as reducing *** [the subsequent medical professional's] future compensation." Between December 19 and 27, 2013, defendants allegedly drafted an

amendment to eliminate the Pension Plan's 62% hypothetical allocation group. Representatives of the Pathology Group executed that amendment on December 27, 2013. On March 18, 2014, defendants allegedly advised the Pathology Group that the subsequent medical professional had no reasonable expectation of claiming the benefit of the 62% hypothetical allocation group.

¶ 7        Defendants' legal representation of plaintiffs allegedly ended in April 2014. Plaintiffs then allegedly retained legal counsel to review and correct the defects resulting in the loss of the Pension Plan's tax-qualified status. Plaintiffs eventually received compliance letters from the IRS that stated the tax-qualified status was retroactively restored.

¶ 8        On May 19, 2015, and February 5, 2016, respectively, the subsequent medical professional filed an administrative claim and a federal lawsuit against plaintiffs, claiming an entitlement to the benefit of the 62% hypothetical allocation group. The subsequent medical professional's administrative claim was denied. However, in January 2017, summary judgment was entered for the subsequent medical professional in the federal lawsuit. As a result, on May 6, 2017, the subsequent medical professional and plaintiffs entered a settlement agreement. As relief for counts I and II, plaintiffs requested monetary damages and reimbursement for the costs of this lawsuit.

¶ 9        On August 14, 2019, defendants requested a dismissal of counts I and II of plaintiffs' fourth amended complaint under section 2-619(a)(5), arguing those counts were barred by the two-year limitations period and/or the six-year repose period contained in section 13-214.3(b) and (c). On November 6, 2019, plaintiffs filed a response to defendants' motion to dismiss. Thereafter, plaintiffs and defendants each filed a reply in support of their respective positions.

¶ 10       On June 3, 2020, the circuit court held a hearing on defendants' motion to dismiss. On June 9, 2020, the circuit court entered a written order, formally granting the dismissal of counts I

and II, with prejudice, on the basis that those counts were barred by the limitations and repose periods contained in section 13-214.3(b) and (c). On July 6, 2020, plaintiffs filed a timely appeal.

¶ 11                                                    II. ANALYSIS

¶ 12            In this appeal, plaintiffs challenge the circuit court's dismissal of counts I and II of their fourth amended complaint based on the limitations and repose periods contained in section 13-214.3(b) and (c). The limitations and repose periods contained in those statutory provisions are independent timing requirements in legal malpractice actions. See *Sorenson v. Law Offices of Theodore Poehlmann*, 327 Ill. App. 3d 706, 708 (2002); 735 ILCS 5/13-214.3(b), (c) (West 2018). Therefore, plaintiffs' inability to comply with either timing requirement is fatal to this case. Since we conclude section 13-214.3(b) independently forecloses plaintiffs' lawsuit, we decline to address the parties' arguments under section 13-214.3(c).

¶ 13            Initially, defendants' motion to dismiss was filed under section 2-619(a)(5). As such, defendants admitted the legal sufficiency of counts I and II but asserted, as a basis for involuntary dismissal, those counts were "not commenced within the time limited by law." See 735 ILCS 5/2-619(a)(5) (West 2018); *Scheinblum v. Schain Banks Kenny & Schwartz, Ltd.*, 2021 IL App (1st) 200798, ¶ 22. When ruling on such a motion, the circuit court interprets the pleadings and supporting documents in the light most favorable to the plaintiff. *Snyder v. Heidelberger*, 2011 IL 111052, ¶ 8. Well-pleaded facts and reasonable inferences are admitted as true. See *id*. If the facts are undisputed and only one conclusion is evident, then the circuit court may determine, as a matter of law, when a limitations period began. See *Brummel v. Grossman*, 2018 IL App (1st) 162540, ¶ 22. Our court reviews *de novo* whether a genuine issue of material fact precluded the dismissal or, absent such a genuine issue of material fact, whether the dismissal was proper as a matter of law. See *id*. ¶ 24; *Snyder*, 2011 IL 111052, ¶ 8.

¶ 14    A limitations period requires the prosecution of a cause of action within a reasonable time to prevent the loss or impairment of evidence and discourage delays in the filing of claims. See *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 21 (quoting *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 170-71 (1981)). As such, a limitations period determines the time within which a lawsuit may be filed after the accrual of a cause of action. See *Folta v. Ferro Engineering*, 2015 IL 118070, ¶ 33; accord *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 16. A cause of action accrues when facts authorizing a lawsuit exist. *Khan*, 2012 IL 112219, ¶ 20.

¶ 15    Relevantly, section 13-214.3(b) states, an "action for damages *** against an attorney arising out of an act or omission in the performance of professional services *** must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2018). This provision incorporates the discovery rule, which postpones the commencement of a limitations period until the injured party knows or reasonably should know of the injury and its wrongful cause. See *id*.; *Snyder*, 2011 IL 111052, ¶ 10; *Khan*, 2012 IL 112219, ¶ 20. After discovering the injury and its wrongful cause, the injured party has the burden of inquiring about the existence of a cause of action. See *Khan*, 2012 IL 112219, ¶¶ 20-21 (quoting *Nolan*, 85 Ill. 2d at 170-71). Once it reasonably appears there was an injury and it was wrongfully caused, an injured party may not slumber on his or her rights. *Id*. ¶ 21 (quoting *Nolan*, 85 Ill. 2d at 170-71).

¶ 16    In this context, "wrongfully caused" does not connote knowledge of negligent conduct, a cause of action, or the full extent of an injury. See *id*. ¶ 22; *Scheinblum*, 2021 IL App (1st) 200798, ¶¶ 25, 29. That term must be viewed generically and not as a term of art. *Khan*, 2012 IL 112219, ¶ 22 (citing *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 416 (1981)). A person knows or reasonably should know an injury was "wrongfully caused" when there is sufficient

information concerning the injury and its cause to put a reasonable person on inquiry about whether actionable conduct occurred. See *Scheinblum*, 2021 IL App (1st) 200798, ¶¶ 25, 29 (quoting *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, ¶ 13); accord *Carlson v. Michael Best & Friedrich LLP*, 2021 IL App (1st) 191961, ¶ 81.

¶ 17    Moreover, the necessary injury is not a personal injury or the attorney's mere negligence. See *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). The necessary injury "is a pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission." *Id.* (citing *Eastman v. Messner*, 188 Ill. 2d 404, 411 (1999); *Palmros v. Barcelona*, 284 Ill. App. 3d 642, 646 (1996)). As a result, a party is not injured by an attorney's legal malpractice unless and until there is a loss for which monetary damages may be sought. *Id.*; accord *Zweig v. Miller*, 2020 IL App (1st) 191409, ¶ 30. Indeed, even if negligence is established, a cause of action does not exist unless the injury proximately caused monetary damages. See *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306-07.

¶ 18    For this reason, monetary damages are "essential to a viable cause of action for legal malpractice." *Id.* at 307. Those monetary damages must be affirmatively established by the aggrieved client and are never presumed. *Id.* (citing *Eastman*, 188 Ill. 2d at 411; *Griffin v. Goldenhersh*, 323 Ill. App. 3d 398, 404 (2001)). If there is merely a possibility of harm or the monetary damages are speculative, then monetary damages are absent and no legal malpractice action exists. *Id.*; see also *Zweig*, 2020 IL App (1st) 191409, ¶ 30. Monetary damages are speculative only if their existence is uncertain. *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 307; accord *Zweig*, 2020 IL App (1st) 191409, ¶ 30. We emphasize that monetary damages are not speculative if their amount is merely uncertain or yet to be fully determined. *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 307; accord *Zweig*, 2020 IL App (1st) 191409, ¶ 30.

7

¶ 19 A loss for which a party may seek monetary damages in a legal malpractice action will generally not occur until after an adverse judgment, settlement, or dismissal of the underlying action caused by the attorney's negligence. *Zweig*, 2020 IL App (1st) 191409, ¶ 30; accord *Construction Systems, Inc. v. FagelHaber, LLC*, 2019 IL App (1st) 172430, ¶ 20. However, a legal malpractice action may accrue before that time if it is "plainly obvious" the plaintiff has been injured by professional negligence or the attorney's neglect is a direct cause of legal expenses incurred by the plaintiff. See *Zweig*, 2020 IL App (1st) 191409, ¶¶ 30, 35, 38 (holding the limitations period for a legal malpractice claim commenced, at the latest, when the plaintiff paid attorney fees to successor counsel to rectify defendants' professional neglect and where the plaintiff, who was not sued for that neglect, argued those attorney fees were directly caused by the neglect and any success in a lawsuit against third-parties would not negate those attorney fees); *Construction Systems, Inc.*, 2019 IL App (1st) 172430, ¶¶ 29-30 (finding, when the successor counsel learned of the defendant's neglect and was paid to minimize that neglect, it was obvious the plaintiff suffered a nonspeculative injury, such that a legal malpractice lawsuit would not be premature or dependent upon the underlying case); *Nelson v. Padgitt*, 2016 IL App (1st) 160571, ¶¶ 22-23 (finding the plaintiff, a sophisticated businessman who eventually retained successor counsel, knew his economic loss stemmed from an employment agreement negotiated by an attorney who failed to include provisions for economic protection, as instructed, such that he did not need an adverse judgment to know he was injured). Our supreme court has recognized this may be the case where, before an adverse judgment or settlement, there is a pecuniary loss directly attributable to an attorney's neglect and the client knew or should have known of the loss when taking affirmative action to mitigate the pecuniary loss. See *Suburban Real Estate Services, Inc. v. Carlson*, 2022 IL 126935, ¶¶ 28, 35 (discussing *Zweig*, *Construction*

8

*Systems, Inc.*, and *Nelson* in the context of pecuniary losses for which a party may seek monetary damages for attorney neglect before an adverse judgment or settlement).

¶ 20    Here, plaintiffs concede, as early as December 20, 2013, they "became undoubtedly aware of the possibility of damages" due to defendants' legal malpractice. Plaintiffs alleged, in December 2013, they became aware of a "miscalculation" related to the subsequent medical professional's accruals and the "strategies for recouping th[e] excess benefits." Similarly, plaintiffs admit emails exchanged with defendants on December 8 and 9, 2013, "discussed whether *** [the subsequent medical professional] should be included in the 62% category." On December 19, 2013, plaintiffs acknowledge defendants "calculated the potential excess benefits that *** [the subsequent medical professional] could claim and scheduled a conference with Plaintiffs." For that conference, defendants "prepared a detailed memorandum for Plaintiffs *** acknowledg[ing] the consequences of disqualification of the Pension Plan."

¶ 21    However, plaintiffs argue the possibility of monetary damages was insufficient to trigger the limitations period contained in section 13-214.3(b). Plaintiffs note the subsequent medical professional initiated an administrative claim and a federal lawsuit on May 19, 2015, and February 5, 2016, respectively. The federal lawsuit resulted in summary judgment for the subsequent medical professional in January 2017 and a settlement agreement was executed on May 6, 2017. As such, plaintiffs argue their claims of legal malpractice accrued on May 6, 2017. Plaintiffs argue their alleged injuries were not "plainly obvious" before that date. At the earliest, plaintiffs suggest their cause of action accrued within the limitations period in April 2014, when successor counsel was actually hired to review and correct the defects in the Pension Plan.

¶ 22    In response, defendants argue plaintiffs were alerted of the issues related to the 62% hypothetical allocation group and the subsequent medical professional as early as March 7, 2012,

when the subsequent medical professional inquired about that benefit. Further, defendants argue the parties' communications in December 2013 evince plaintiffs' knowledge of those issues and their resultant injuries. To determine benefit accruals for 2013, defendants, on December 8, 2013, inquired about the subsequent medical professional's qualifications. A representative of plaintiffs replied, "[d]oes this mean that the accruals for *** [the subsequent medical professional] have been miscalculated?" Likewise, on December 19, 2013, the Pathology Group was informed of the amount required to make the Pension Plan IRS-compliant. Defendants then prepared to eliminate the 62% hypothetical allocation group. At the latest, defendants argue plaintiffs knew of their injuries when the Pathology Group took that action on December 27, 2013. Since plaintiffs filed this lawsuit on December 29, 2015—2 years and 2 days after that action—defendants argue plaintiffs' legal malpractice claims are barred by section 13-214.3(b).

¶ 23       Based on the undisputed facts of record, we conclude plaintiffs knew or reasonably should have known, before December 29, 2013, *i.e.*, more than two years before the filing of this lawsuit, that defendants wrongfully caused monetary damages. Plaintiffs may not have known the full extent or amount of the monetary damages, but they possessed sufficient information about defendants' administration of the Pension Plan to timely inquire about the existence of monetary damages and a cause of action for legal malpractice. See *Khan*, 2012 IL 112219, ¶¶ 20, 22; *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 307; *Scheinblum*, 2021 IL App (1st) 200798, ¶¶ 25, 29; *Carlson*, 2021 IL App (1st) 191961, ¶ 81; *Zweig*, 2020 IL App (1st) 191409, ¶ 30. Plaintiffs knew, contrary to their intent, that the 62% hypothetical allocation group remained in existence and was applicable to the subsequent medical professional. Plaintiffs also knew the subsequent medical professional, despite his qualifications, was not receiving the benefit of the 62% hypothetical allocation group, which partly caused the Pension Plan to lose its

10

tax-qualified status. Importantly, defendants informed plaintiffs of the amount in excess benefits claimable by the subsequent medical professional, the amount required for the Pension Plan to become IRS-compliant, and the consequences of the Pension Plan losing its tax-qualified status. See *Carlson*, 2021 IL App (1st) 191961, ¶¶ 82-83 (holding the plaintiff was on notice of legal malpractice, due to sufficient information about an injury and its cause, when the plaintiff's accountant informed him he "potentially [had] a real problem" after he "left 12 million on the table" in negotiations).

¶ 24        Therefore, as of December 29, 2013, the subsequent medical professional may not have claimed any amount in excess benefits under the 62% hypothetical allocation group, but it was "plainly obvious," before that time, defendants' neglect caused a pecuniary injury related to the loss of the Pension Plan's tax-qualified status. See *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306-07; *Zweig*, 2020 IL App (1st) 191409, ¶¶ 30, 35, 38; *Construction Systems, Inc.*, 2019 IL App (1st) 172430, ¶¶ 20, 29-30; *Nelson*, 2016 IL App (1st) 160571, ¶¶ 22-23. The disqualification of that tax status, at a minimum, resulted in the loss of some or all of plaintiffs' income tax deduction for contributions to the Pension Plan. Further, at that time, plaintiffs realized the need to incur IRS compliance fees and associated attorney fees and costs from defendants or other legal counsel to regain the Pension Plan's tax-qualified status. Indeed, the record clearly indicates, before December 29, 2013, plaintiffs worked with defendants to correct the issues related to the subsequent medical professional and the 62% hypothetical allocation group, which partly caused the loss of the Pension Plan's tax-qualified status. Plaintiffs ultimately chose to eliminate the 62% hypothetical allocation group but other "strategies for recouping th[e] excess benefits, such as reducing *** [the subsequent medical professional's] future compensation," were considered. Presumably, for IRS compliance, this action would be

11

taken after plaintiffs, despite their initial intent for the 62% hypothetical allocation group, voluntarily paid the subsequent medical professional the amount claimable in excess benefits. Importantly, the subsequent medical professional's success in claiming those excess benefits under the 62% hypothetical allocation group could fully determine or add to, but not negate, the otherwise independent and nonspeculative pecuniary injuries related to the Pension Plan's tax-qualified status. See *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 307; *Zweig*, 2020 IL App (1st) 191409, ¶¶ 30, 35; *Construction Systems, Inc.*, 2019 IL App (1st) 172430, ¶¶ 29-30.

¶ 25        In sum, well before the adverse settlement with the subsequent medical professional on May 6, 2017, plaintiffs suffered a pecuniary loss that was directly attributable to defendants' alleged professional neglect when administering the Pension Plan. See *Carlson*, 2022 IL 126935, ¶¶ 28, 35. Plaintiffs knew of that pecuniary loss before December 29, 2013, when they considered and decided upon affirmative action, *i.e.*, the elimination of the 62% hypothetical allocation group, to mitigate their pecuniary loss. See *id*. Therefore, we hold counts I and II of plaintiffs' fourth amended complaint were properly dismissed under section 13-214.3(b). By virtue of this holding, we decline to review the parties' arguments under section 13-214.3(c).

¶ 26                                III. CONCLUSION

¶ 27        The judgment of the circuit court of Peoria County is affirmed.

¶ 28        Affirmed.